Good morning, Your Honors. May it please the Court. Harini Raghupati on behalf of Mr. Cano. The government had two easy options to search Mr. Cano's phone consistent with the Fourth Amendment. Under Cotterman, it could have manually searched his phone while he waited in line at the port of entry. Or, after he was arrested, it could have obtained a warrant, which the Supreme Court recognized in Riley is a quick and efficient thing to do. But instead, the government here did neither. It waited until after Mr. Cano was arrested, after the contraband was confiscated, and after Mr. Cano's phone was seized, to conduct three different warrantless searches of his cell phone. At that point, the scope of the government searches no longer fit within the border search exception, and the warrantless searches were unreasonable. What was uncovered in the searches specifically that was sought to be suppressed? There were three searches, two manual, one forensic. The searches uncovered the fact that Mr. Cano had deleted all of his text messages prior to crossing the border, and the government introduced the deletion of his text messages in its case-in-chief and repeatedly argued throughout closing that the deletion of the text messages was evidence of Mr. Cano's guilt. And the government here has also waived any argument that the use of evidence from the cell phone was harmless beyond a reasonable doubt at trial. And so I don't think there's a dispute at this point that its use of the evidence was prejudicial to Mr. Cano. So the district court here focused on Cotterman and said that Cotterman was the authority that authorized the searches here. But Cotterman is simply an opposite, because Cotterman is a true border search case. In Cotterman, the agents searched the laptop prior to Mr. Cotterman being arrested, and the agents were looking for contraband specifically contained on the laptop. So they were looking for evidence of child pornography. Cotterman simply doesn't control a post-arrest search of a cell phone for evidence of a crime, not for contraband, when the contraband has already been confiscated. Well, Cotterman also didn't Correct, Your Honor. search, it seems, of limited value to me. I would agree, Your Honor. I was pointing out Cotterman because the district court relied on it both to authorize the search and also for the purposes of the good faith exception, which I'd like to talk about briefly. The district court found that even if suppression weren't warranted, or even if the searches were unconstitutional, suppression wasn't warranted under the good faith exception. And the district court specifically pointed to Cotterman as authority on which the police could rely in conducting the searches here. But Cotterman, as I pointed out, is not, its reasoning doesn't transfer over to a post-arrest search for evidence related to a crime. And I would also note that in this circuit, the good faith exception is different than qualified immunity. So the question under the good faith exception is whether there is appellate precedent that specifically instructs the officers that If the appellate precedent is at most unclear or only offers a plausible basis on which the officers' actions were constitutional, then the good faith exception doesn't have application in this circuit. And that's United States v. LARA that provides that. I have a question about the relationship among the claims that you're making on appeal. If we agree with you about the suppression question, and there were therefore a new trial, would we have to reach any of the other questions, the Brady question and I forget what the third one is? The third one, Your Honor, was about statements made at closing. But no, if this court were to agree with our arguments about the suppression, then it would be unnecessary to reach those other two issues. Conversely, if this court were to reach the Brady question, I think we would still have to reach the Fourth Amendment question because the remedy for the Brady question is only a limited remand. And so it would still be necessary to reach the Fourth Amendment question. So what is the rule that you want the court to apply? The rule that we want the court to apply is that when there is a post-arrest search of a cell phone, even if it occurs at the border for evidence of a crime, the police must obtain a warrant in order to do so. So the rule is that once the police arrest somebody, that the fact that it occurs at or near the border is irrelevant? Yes, Your Honor. And all the And I would note that the government would still be able to get access to the deleted text messages from Mr. Cano's phone. It would simply be that they would have to obtain a warrant, which, again, as the Supreme Court explained in Riley, in many jurisdictions you can simply e-mail in an application for a warrant. It's not a very difficult process here. So you're – but you're swimming upstream against a Fourth Circuit's case. Is that right? No, Your Honor, in part. So the government has cited four Out-of-Circuit cases. They all resolve the dispute on the basis of the good-faith doctrine. They don't reach – And Calouse does that as well? Yes, Your Honor. And they don't reach the question of whether a warrant was required. Colesview says that even though the search occurred post-arrest, it was still a border search, but it doesn't reach the question of whether a warrant was nevertheless required, even if it were a border search. It simply says that the officers acted in good faith in conducting the search. And so there's no merits-based determination out of any of those four circuits about whether a warrant was required. I would also note that the Seventh and Eleventh Circuit's decisions are more like Cotterman in that they're pre-arrest searches of digital devices for contraband contained on those devices. And so I don't think that there's any circuit split that would arise out of the Seventh and Eleventh Circuit decisions. If there are no further questions on that, I'd like to briefly discuss the second issue related to the government's disclosure violations. So here, the government's failure to turn over specific information that Mr. Cano requested from the DEA and the FBI violated both its Brady obligations and Rule 16. And focusing on the facts of this case, Mr. Cano made two very tailored requests for information that were time-circumscribed and also geographically limited. He wanted first information about the Latin King's connection to importation, and that was geographically limited to the United States-Mexico border. And then second, he wanted information about Medina, his cousin's connection to drug trafficking, which was time-bound between August 2015 and July 2016. So it was less than a year-long period that he was requesting information for. And this was information that the government had knowledge of. So I'll start off with the Latin King's. The government knew, based on the FBI's 2015 gang report, that the Latin King's had been identified as one of the top gangs that were involved in cross-border crimes. And that included large-scale drug transportation and smuggling drugs across the United States-Mexico border. My question about the Latin King's, and I may be misremembering or misunderstanding the record, but it seemed to me that the defense did have some information about the Latin King's, and that the district court excluded that from the trial. Is that correct? Correct, Your Honor. And you are not challenging the exclusion. That's not one of the claims on appeal. So if that's true, where do you get materiality if the additional information presumably also would have been excluded? I don't think there's any indication that the additional material would have been excluded. The district court excluded the gang report because it said that it would spawn, essentially, speculation for the jury. But the materiality standard that triggers a discovery obligation on the part of the government is different than the standard that evidence can be excluded for unduly prejudicial and 403 grounds. So what's the added relevance of this material, in your view? Well, it would provide a missing link that the Latin King's were directly involved in the United States-Mexico border. So what the jury heard was a stipulation by the parties that the Latin King's were a gang that operated domestically in drug distribution, and that they obtained their drugs from other transnational gangs that operated along the United States-Mexico border. But if the discovery request contained or led to information that showed the Latin King's were directly involved in importation, that certainly would have been evidence of a different kind that would have substantiated Mr. Cano's defense here, that his cousin who was a member of the Latin King was responsible for secreting the drugs in his truck. I would also note that this court in both Stever and Doe has said in similar cases where the government hasn't turned over the relevant information, it's simply impossible to judge prejudice because we don't know what the information would say. And so I think any prejudice analysis is not only premature, but under Stever and Doe, it's actually impossible at this point. So we would be asking for a remand to the district court so that the government could disclose the relevant information, and the district court could then determine both under Brady and Rule 16 whether the information, whether there was a likelihood or a reasonable probability that the information may have altered the verdict. And so what is, and so what is the rule that you think that, that, what is it that you think the government's required to do? You think that all federal agencies have to come forward with evidence? No, Your Honor. I think even if we cabinet to the specific, we're simply asking for an application of Bryan and Santiago to this case, which is that where the government has knowledge of and access to the requested materials, regardless of whether those agencies are involved in the investigation or not. Okay, I'm sorry, knowledge and, knowledge and access? Correct, Your Honor. And what does that mean in this context? So in this context, the government knew both of the Latin Kings. Okay, when you say that, when you say the government, I need you to give me an agency. So in this case, both the U.S. Attorney's Office, as well as Homeland Security's investigation, knew that the Latin Kings were involved in drug importation across the United States-Mexico border because Mr. Cano met his burden to produce some evidence of that. He pointed to the FBI's National Gang Report. He also pointed to the Flores twins who were examples of- Okay, I'm sorry. Is the U.S. Attorney responsible for knowing about reports that the FBI has issued generally? Pardon me? No, Your Honor, but there are a line of cases that we cite in our briefs that the government has a duty to learn of information once the defendant presents some evidence that the government possesses that information. And so that's what we're relying on here. Mr. Cano presented some evidence that the Latin Kings were connected to importation because he provided the FBI's gang report and he provided the news articles about the Flores twins. Therefore, that was some evidence that the government then had a duty to learn about whether- The U.S. Attorney needs to request information from the FBI and the DEA that would be responsive to those requests. Do you have any case that's even close to this? This is the broadest reading of Brady I have ever heard. And I'm wondering if any other court at any time has ever done anything this close. Well, Your Honor, I would say it's a straightforward application of the knowledge and access test from Brian, but I would also point out- If it's a straightforward application, you shouldn't have any difficulty pointing to a court that's enforced this. Well, I will say that in this case, one point that I would like to note before I would like to reserve the remainder of my time, if I may, is that the government relied on information from the DEA in its very prosecution of Mr. Cano. And so the government called Special Agent Peter Kiesel, who was an HSI agent, but he had six and a half years on Operation Alliance, which was a cross-agency task force between the DHS and the HSI. And they used his experience to testify about the value of the drugs. And they also tendered him as a witness on the structure of drug trafficking organizations, which ultimately didn't come in. But I think Agent Kiesel's role in the case is important because it shows that the government was using information. The prosecutor was using information. Right. And if they came across anything that was exculpatory, they would have an obligation under Brady to turn it over to you. But the fact that they've used the DEA agent, now you want to leverage that to say, you now have you now must have access to everything the DEA knows. That's a very that's a much, much broader rule. And all I'm asking is, is there any case in any jurisdiction that has ever held a rule that broadly? That's a very, very broad reading of Brady. I would push back, Your Honor, on how broad the requests are. As I mentioned, they were time circumscribed and geographically bound. I don't have a case to point to, but I would like to reserve the remainder of my time, if I if I may. You may. Thank you. Good morning, Your Honors. May it please the Court, Mark Brady for the United States. Starting with the border search issue, Your Honors, we submit that the district court reasonably construed Cotterman to allow for this search. Well, we have de novo reviews, so we don't care what the district court said. The question is whether this was a border search after the arrest took place or whether that is now a post, an ordinary post-arrest search. Correct. And our position is just because the arrest happened, that doesn't change the nature that this still falls within the border search. Why? Why isn't it the opposite? Why isn't this an ordinary post-arrest search? And the fact that it happens to occur near the border or at the border is completely irrelevant. Because as the agent, Special Agent Patonick, testified below, they conducted searches before they interviewed the defendant, before he's even left the border. And he says, we have dual purpose for this search. It's not just to investigate the crime that we already have probable cause, the 30 pounds of cocaine, but to also look for evidence of other ongoing efforts to smuggle drugs. And as the Fourth Circuit held in United States versus Holsteins, the border search exception is certainly broad enough to reach more than just actual contraband. This court held as much, I cited a case United States versus Shure from 1979. That was a case where... How is any of this applicable after Riley though, where that circumscribes quite a bit cell phone searching? Well, I would maybe disagree with the implicit premise of that, Your Honor. There is, I would submit that Riley is not clearly reconcilable with Cotterman. If you put those two... Well, they're about two different things, really, because Cotterman didn't have an arrest. So we don't have any discussion in Cotterman of whether its principles apply post-arrest or not. True. And Riley, the Supreme Court specifically went out of its way to say, we are only talking about the search incident to arrest exception, and there are other case-by-case exceptions. The border search doctrine has been around for too long. I know that, but I guess I have trouble seeing post-arrest, how it's still considered a border search at that point. Is he trying to come in at that point? No, he's not trying to come in. But at this point, they know that he has drugs. He may have more drugs elsewhere in his vehicle. That makes it really important, might make it really important for them to get a warrant, and maybe really easy to get it. But the question is whether you can still use the fact that he's at or near the border to justify that search. He is no longer a danger to come into the United States. He's sure he's no longer a danger, but unlike somebody for whom there is no probable cause, he is now a known threat to the sovereignty of the border. He is caught with 30 pounds of drugs. I mean, his property still has to be searched before he gets admitted, like any other person applying for admission at the border. Except the kind of immediate search that you would do of someone's cell phone coming in would be, say, to look for child pornography on the phone. But you wouldn't be reading their text messages or figuring out if they deleted their text messages. And you couldn't, I think, at the border, read all the email to see if somebody and his cousin had written to each other about the possibility of robbing a bank two months later. I mean, how far does your argument go? Well, if it was, if the facts were similar to that, I would agree there might be an issue, Your Honor. But here, I mean, Agent Patonick, in Excerpt of Record 194, even testified that he's previously found, from these border searches, evidence of other co-conspirators coming through the border with drugs. Well, but none of that is relevant to the question of whether he should have gotten a warrant before he found out that investigatory information. Nobody's challenging that there's potentially information. The only question is whether a warrant is required. But, I mean, if it's a paradigmatic exception to the warrant requirement, Your Honor, the border search exception, I mean, it can't just be that the minute he's arrested, he's at the border, that the border completely goes out of the picture, can it? I mean, in this court, you know, he's not riding on a bullet. Well, not for other things. I mean, if they had only partially looked at the car and they wanted to continue to look to make sure there wasn't a bomb there or something like that, bringing other kinds of contraband, the fact of the arrest might not. But the sort of looking, you know, rummaging through the contents of the emails to determine whether they could prove a bigger case against this individual seems to me pretty far afield from the point of the border search exception, which is to prevent, you know, dangerous objects or people from coming in. The cell phone is not per se dangerous. And the kind of information they were looking for was to help prosecute him. It wasn't to protect the border. Well, I respectfully disagree with that, Your Honor. Then you would have to ignore Special Agent Patonick's testimony, an excerpt of record 193-94 and also 668, which the district court credited, where he said it's not just to investigate an already completed crime. And I would also point to United States v. Soto Soto. That's a case that my opponent relies on, where she distinguishes, she tries to compare this case to that case. There in Soto Soto, this court said, you know what, if an FBI agent just set up an ad hoc search at the border to look for stolen cars, that wasn't a true border search because he's not a customs agent. And he, in the opinion, specifically cites his testimony where he admitted, I'm not here to enforce any customs laws. I'm only looking for stolen vehicles. Tell me what harm occurs if once an arrest is made, we require traditional search warrant requirements. What damage is done to border security? Well, I think in a case like this, you know, we've all sort of assumed that these things can be, there is no evidence in the record that these warrants could be secured so easily. The other thing I would suggest is the facts of this case. They're trying to interrogate somebody. They want to be able to flip through the phone before they interrogate to actually have information. I mean, if you talk about a warrant, who knows how long that takes? But there isn't sufficient reason to get a warrant, then basically the harm is the Fourth Amendment's worked? I understand, but I would submit that in any exception to the warrant, you could say, you know. Counsel, you just asked a rhetorical question. How long does it take to get a warrant? I would think that you might have an answer to that. Can you give us an answer as to how long it takes to get a warrant? I mean, I, you know, I know there's reference to telephonic. There was no evidence in the record that said, you know. Have you ever requested a telephonic search warrant? I have not, Your Honor. No. Have you ever participated in any investigation in which one has been requested on a quick basis? I've been in appeals for quite a long time, Your Honor, so I don't have any of those responsibilities, unfortunately. But I would say if all these concerns, too, then, I mean, if you look at what the Fifth Circuit held in Molina Isadora, the Fourth Circuit held in Colesuse, those same concerns were presented to those courts, and they found that they didn't outweigh the traditional balancing of the border search exception. There still has to be some credence given to the fact that, as the Supreme Court has held for a long time now, the balancing of interests at the Fourth Amendment is qualitatively different than the interior of the country, and there has to be some sort of allowance for security. Under my opponent's view, the only search that could other crimes, as the Fourth Circuit held in Colesuse, when you have an importation offense. So let's go back to my example. Is it okay for the border search to just read all your emails and they find one, you know, where you say, I think in a couple months my cousin and I would like to rob a bank because we're kind of short of cash. And, you know, is that okay? They can then just read that and follow up on that at the border? Under Cotterman right now they can, because if that's just something that they find right off the bat. Right, but there Cotterman was not arrested. Right, but I mean, Judge Graber's question was, if Cotterman comes to the border and they look through his, and they read all his emails and they find out about a bank robbery, whether or not he's been arrested, I would say absolutely they can use that information. And that's an ombud decision. That's what the court held. They said, we're going to give very much so the same solicitude to the privacy interests that the Supreme Court recognized in Riley were recognized by Judge McKeown in the Cotterman opinion. And she said, the balance that we're going to have is that for a quick manual search, you require no suspicion. And for a forensic, something more involved, you require reasonable suspicion. So it was what happened here that was ultimately damaging in the trial or introduced in the trial was from the forensic search? Actually, but my review of the record, it was from both, which to me is saying it's just the manual search. There were three things. Wait, wait, wait, that doesn't, I don't understand that. There were three things that were found. The WhatsApp messages and his lengthy call log. His lengthy call log was also secured independently through a different warrant. That's not no longer an issue on appeal. The only things that are those messages and agent, the tone is the deletion of the message. And so how do you know from just looking that they have been deleted as opposed to not seeing any? Well, my guess is, you know, I don't want you to guess. I want to know what's in the record. Well, if I had a phone, I'd look at my phone and you go under text messages and it has the last 300 calls. Okay. So if you have none, I think the reasonable inference is what he made. Why? I don't have, I delete mine regularly because I don't like to have a lot of junk on my phone. Or what if it was just a burner? Well, okay. Then I would submit the following. When he asked the defendant in the post arrest interview, the defendant then admitted that he I'm not, I'm still trying to understand the answer to my question, which was, were those deletions determined to have occurred through the forensic examination? And I would say an excerpt of record 219, special agent Petonic, who didn't conduct the forensic search said he had a lengthy call log, but a lack of any text messages. Right? So that tells me that he did. It doesn't say he deleted anything. It says he didn't have any. I'm still wanting to know, how did they know they had some that were deleted in terms of examining the phone? I don't think I can answer that question then, Your Honor, because they asked him. He said, I looked through the phone. I didn't see any. He then comes to that conclusion. I mean, I, I mean, I think the reason that we're, that we're asking these questions is we're trying to figure out if there's any, there's some really big legal questions here that are dividing circuits or potentially dividing circuits. And we're trying to figure out whether there's any consequence at all to a decision that we might be forced to make. Does this matter to anybody? The government's fighting pretty hard here and yet it can't tell us whether it actually got any information that was introduced at trial that was actually obtained from the forensic search as opposed to the manual search. But I am telling you that, Your Honor, special agent Petonic. I'm not running away from this, special agent Petonic. Let's try this again. Was, did the government introduce any evidence at trial that was introduced as a result of the forensic search? I think it's cumulative. They introduced the fact that there were no text messages. It's a yes or no question. Did they introduce such evidence? They did. Special agent Medrano said, I ran a forensic search and I found deleted text messages. They asked special agent Petonic, when you did your handheld manual search, what did you find? I found a lack of text messages in the WhatsApp application. When I see that, I say, well, that's the same information. No, it is not the same information. One says there's nothing and one says it was deleted. That's like saying, you know, it's the same to say, I don't see a dog in your house as to say, you know, the dog died last week. It just fills in a lot more information. Okay. Well then, I mean, then yes, we did. We did introduce something from a forensic search. Okay. Yeah. The fact that he had no text messages. Well, the fact that he had no text messages, I mean, even I could look at a phone and say, I don't see any text messages on here. That wouldn't show whether text messages had been on the phone and were deleted. It might be a brand new phone. I just, I just got it. Nobody sent me any text messages yet. I failed to, I think I see what you're saying now. Okay. So, so what, so what, what precisely did the government introduce? I mean, I, I, then there was the forensic that had everything. And it showed that there had been messages on the phone that had been deleted. That is my, okay. Yes. But are you, are you claiming that the government should be able to do that type of evaluation of anybody who comes across the border that they, they say we have a reasonable suspicion. So we're going to do a forensic examination of your phone? Well, that's, or, or is it only if they get arrested that you can do the forensic evaluation? No, we're saying under Cotterman, Cotterman itself says, as long as you have reasonable suspicion, irregardless of the fact of arrest, you're entitled to do the forensic evaluation. And in January, 2018, the CBP promulgated their own internal policy, which basically codifies that same rule. And you don't think Riley is significant in that in terms of I think it's significant because again, it, you know, if, if, if we read Cotterman 2013, Riley 2014, if Cotterman in 2013 said, oh, cell phones, you know, they're ubiquitous, but no big deal. Not that important. And then Riley comes along and says, no, they have a very heightened privacy interest. I'd say then there might be an issue. But when I read Cotterman and reread it, Judge McKeon gave the same solicitude as to that privacy interest as did Cotterman in terms of quantity and quality. There's terabytes worth of information. There's also a distinction though, in that Cotterman, there was, the effort was to find contraband, which is different than finding evidence of a, of a crime that is not per se contraband. Why isn't that an important distinction? In United States versus wrong, 455 F 3rd at 997, this court held that the border search doctrine is not limited to those cases where searching officers have reason to suspect the entrant may be carrying foreign contraband. In United States versus sure in 1979, this court interpreted the border search exception to apply not just to contraband, but to instrumentalities. That's why I would say that distinction is not controlling this case, Your Honor. So is it your assertion that this phone was an instrumentality? That isn't really how I understood your argument. Exactly. But you know, when I draw on that, I'm not making that up out of thin air. It's for sure. And sure the case was there was 4,500 grams of heroin supposed to be shipped from Thailand to United States. They get seized in Thailand and authorities there say, we know the two people they're coming to the United States. When they get to the United States, they're then already have the drugs. There's no more contraband coming in, but they find air. Well, how would you, how would, how would we know that there was no more contraband coming in? I understand that we, that we caught what we think was the majority of the shipment, but that wouldn't prove that there wasn't anything to discover on the people coming into the United States. Well, I suppose that's true. But I, the way I read the case was, you know, we saw, we seized the 4,500 grams and I thought that was the totality. And they said, look for evidence in what the customs agents did. They found documents, papers, not actual contraband. So I cited that simply as an example of, you know, the border search. It's not been limited to contraband per se. And even Kolsuse, the Fourth Circuit, made that same point, which is that the justification behind the border search exception is broad enough to accommodate not only the direct interception of contraband as it crosses the border, but also the prevention and disruption of ongoing efforts to explore contraband, which is exactly what Agent Patonick testified was one of the purposes of the search in this case. Thank you, counsel. I'd like to make one factual point and then one legal point. So with the factual point, in addition to the text messages that were either deleted or not on the phone, there was evidence introduced of two WhatsApp messages, and this is from the government supplemental excerpts of Record 11, that was also used to discredit Mr. Cano's testimony. So specifically, in closing, the government argued on page 976 of the excerpts of record that the WhatsApp messages were one of the reasons why Mr. Cano was lying. Wait a minute. Those were found, were they not through the manual search and not through the forensic search? Your Honor, I think... Is that true? Yes or no? Can you repeat the question? I apologize. Were those two messages found only through the forensic search or were they found through the manual search? I don't know the answer to that question because I don't think the record distinguishes between which evidence was gathered from the two different... But they hadn't been deleted. They had not been deleted, Your Honor. They were on the phone. And then in terms of the legal point, I'd like to make Mr. Rahe's reliance on border search to instrumentalities of a crime. Both of those cases were cases that were involved pre-arrest searches of people as they were coming into the United States for contraband that they might have been carrying. If we were to adopt the rule that you want, wouldn't we just simply have border agents just decline to arrest somebody until after they'd conducted a more thorough search? Perhaps, Your Honor, but that might also raise independent prolonged detention arguments, but I think that... Might not have taken long, but if under Cotterman they could have taken the phone and run a quick forensic search on this, then they can hold him, but at least not admit him, but not arrest him. I think that is a consequence of this ruling, Your Honor, if this court were to impose a warrant requirement. As I said, I think that there would be other potential issues that might be raised under the Constitution if that were the case, but that's not something that's before this court right now. I agree that that's a potential ramification of this ruling. If there are no further questions, I would... I don't believe there are. Thank you very much. The case just argued is submitted and we appreciate very much the arguments from both of you.
judges: Graber, Bybee, Harpool